Filed 6/27/13  In re Jessica G. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JESSICA G., a Person Coming Under the Juvenile Court Law. | B245354 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br>          Plaintiff and Respondent,<br><br>          v.<br><br>CESAR G. et al.,<br>          Defendants and Appellants. | (Los Angeles County<br>Super. Ct. No. CK75206) |

APPEAL from an order of the Superior Court of Los Angeles County. Albert Garcia, Referee.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant, Cesar G.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant, Jennifer R.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Cesar G. (Father) and Jennifer R. (Mother) appeal from a section 366.26 order, terminating parental rights and identifying adoption as the appropriate permanent plan for their daughter, Jessica G, who was almost nine years old at the time of that hearing.  Father and Mother argue the juvenile court erred in finding the parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) did not apply to the relationship between Father and Jessica.  We affirm.

## BACKGROUND

This is the third time this matter has been before us.  In November 2010, Jessica appealed from a section 366.26 order, identifying legal guardianship as the appropriate permanent plan for her.  In that appeal, her counsel argued the juvenile court erred in finding the parent-child relationship exception to termination of parental rights applied to the relationship between Father and her, and the juvenile court should have terminated parental rights and identified adoption as the appropriate permanent plan.  As discussed in more detail below, we affirmed the order identifying legal guardianship as the appropriate permanent plan for Jessica.  (*In re Jessica G.* (Nov. 17, 2011, B228731) [nonpub. opn.].)

In May 2012, Father filed a writ petition, challenging the order setting a section 366.26 permanency planning hearing.  He argued the juvenile court erred in setting the section 366.26 hearing without a prima facie showing of changed circumstances.  As discussed in more detail below, we denied the petition.  (*Cesar G. v. Superior Court* (July 31, 2012, B241254) [nonpub. opn.].)

In this background section of our opinion, we quote background facts from our two prior opinions, as indicated below.

---

[1] Further statutory references are to the Welfare and Institutions Code.

**Statement of Facts in Case No. B228731** (*In re Jessica G.*, *supra*, B228731, pp. 2-11.)

"Prior to the commencement of these dependency proceedings, Father and . . . Mother . . . shared custody of Jessica on an informal basis. In or about July 2008, when Jessica was four years old, Mother took Jessica to Father's home and did not return for her. In or about September 2008, Mother's sister, Erica K., picked up Jessica from the home of Father's parents while Father was working out of town. Erica K. stated that she would care for Jessica. Thereafter, Father did not provide for Jessica. He saw her one time, on October 7, 2008, when Erica K. brought her to his mother's home for a visit.

"In October 2008, Erica K. contacted the Los Angeles County Department of Children and Family Services (DCFS) and informed a social worker that she planned to seek legal guardianship of Jessica. Erica K. reported that Mother was using drugs, including methamphetamine, and had a mental illness. She stated that Father wanted '"nothing to do with"' Jessica.

"On October 30, 2008, Erica K. informed the social worker that Mother planned to take Jessica back. The social worker advised Erica K. to bring Jessica to the DCFS office. Erica K. agreed to do that. DCFS detained Jessica that day and placed her in foster care.

"On November 2, 2008, the social worker contacted Father and informed him that 'Jessica was placed in protective custody due to general neglect and caretaker absence by both parents.' Father stated that he would appear at the detention hearing. In the detention report, DCFS noted that Father 'appears concerned for his child.'

"On November 4, 2008, DCFS filed a petition under section 300, alleging Mother's substance abuse and mental and emotional problems, and Mother's and Father's failure to provide for Jessica. The petition also alleged: 'The child Jessica G[.] has been diagnosed with developmental delays, mental retardation and speech/language impairment. The child's mother . . . and father . . . are unable to provide the child with appropriate parental care and supervision due to the child's medical problems. The parents have failed to follow through with the child's scheduled medical appointments.

3

Such inability on the part of the child's parents endangers the child's physical and emotional health and safety and places the child at risk of physical harm, damage and danger.'

"Father appeared at the November 4, 2008 detention hearing. His counsel informed the juvenile court that he would submit on detention. Father requested that DCFS investigate whether Jessica could be placed with his mother (Jessica's paternal grandmother). Father was living in his mother's five-bedroom home at the time. Father's counsel told the court that Father 'ha[d] been quite forthcoming' in informing counsel that he had a 'three-year-old conviction for domestic violence with [M]other' and an October arrest for possession of marijuana. Father represented that he had completed 48 out of 52 domestic violence classes. The juvenile court suggested that Father move out of his mother's home and Father agreed to do so. Father's counsel informed the court that Father had been unaware that he could get 'assistance' in caring for Jessica's special needs. Now that Father was aware that assistance was available, his 'preference' was 'that his daughter reside with him.' Jessica's counsel argued that Jessica had thrived in Erica K's care and requested that DCFS 'continue to . . . work with [Erica K.] on getting waivers for her criminal conviction' so that Jessica could be placed with her.

"The juvenile court ordered Jessica to remain suitably placed in foster care. The court also ordered DCFS to complete a pre-release investigation report regarding placement with Father's mother. The court granted reunification services and monitored visitation for Father. The court ordered Father to appear at the January 8, 2009 jurisdiction hearing.

"In a pre-release investigation report, prepared on or about November 6, 2008, DCFS identified several 'safety concerns' at the paternal grandmother's home, including broken windows and metal debris in the yard. The grandmother informed the social worker that she would make repairs as soon as she could, and that she 'would like to remain as a possible relative to care for [Jessica].' DCFS reported that the social worker could not discuss the matter with Father. He had moved out of his mother's home and the paternal grandmother stated that she did not have contact information for him.

4

"On November 7, 2008, the juvenile court ruled that DCFS had discretion to place Jessica with the paternal grandmother once her home was approved. The court also ordered the social worker 'to seek a criminal waiver' allowing Jessica to be placed with the maternal aunt, Erica K.

"On January 6, 2009, DCFS filed a first amended petition against Mother, Father and the father of Mother's infant son. In addition to the allegations about Father set forth above, DCFS also alleged: [']The child, Jessica G[.]'s parents . . . have engaged in numerous violent altercations in which the father choked and punched the mother causing the mother to sustain bleeding lacerations. Such violent altercations on the part of the child's parents endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm, damage and danger.'

"In the jurisdiction/disposition report, prepared on or about January 5, 2009, DCFS reported that the social worker had been unable to contact Father. The paternal grandmother declined to provide contact information for Father, but stated that she would tell Father to contact the social worker at the telephone number provided. DCFS also reported that the paternal grandmother had had a visit with Jessica, but Father had not contacted the foster mother to arrange visitation.

"DCFS listed the following reasons why it could not return Jessica to the care of Father: 'The father has failed to make himself available to the Department and has not shown any effort at addressing the issues that brought the family to the attention of the Department. The father made an inappropriate plan for the care of the child by allowing her to reside with the maternal aunt, [Erica K.]. The father stated that he knew that the maternal aunt had a substance abuse history yet allowed the child, who suffers from multiple developmental delays, to be cared by her [*sic*]. Further, it is unknown if the father has a substance abuse problem as he has failed to make himself available to the Department for a complete assessment, however, his criminal history shows at least one drug related arrest which raises concern that the father may also have substance abuse issues that must be addressed before the child can be safely returned to his care.'

5

"Father appeared for the hearing on January 8, 2009, but was excused by his counsel before the hearing commenced. The juvenile court set the matter for mediation. According to Father's counsel, Father fixed the broken windows at the paternal grandmother's home. The court ordered DCFS to reevaluate the home for possible placement of Jessica.

"On February 5, 2009, Father appeared for mediation and stated that he would 'agree to a case plan following adjudication of the petition that includes suitable placement for Jessica.' The mediation agreement provided that DCFS would 'continue to assess Jessica's paternal grandmother's home for placement.'

"In an interim review report, prepared on or about February 2, 2009, DCFS reported that Father still had not contacted DCFS. Erica K. told the social worker that she believed Father was still living with the paternal grandmother and that Father had 'never provided for the child, paid child support, or cared for the child physically.'

"On March 4, 2009, the juvenile court adjudicated the first amended petition. Father was not present at the hearing, but he was represented by counsel. The court dismissed the allegations against Father regarding his failure to provide for Jessica. The court sustained the allegation about Father's 'violent altercations' with Mother, as quoted above. The court also sustained the following allegation, as amended: 'The child, Jessica G[.] has been diagnosed with developmental delays, mental retardation and speech/language impairment. The child's mother . . . and father . . . have a limited ability to deal with the child's special needs. Such inability on the part of the child's parents endangers the child's physical and emotional health and safety and places the child . . . at risk of physical harm, damage and danger.'

"The juvenile court entered a disposition case plan requiring Father to attend domestic violence counseling, parent education and individual counseling to address family dysfunction and case issues. The court ordered monitored visitation for Father.

"Father appeared for a review hearing on April 8, 2009, and submitted on an order limiting his right to make educational decisions for Jessica. DCFS continued to work with the maternal aunt, Erica K., regarding potential placement of Jessica.

6

"In an interim review report, prepared on or about July 9, 2009, DCFS reported that the foster home where Jessica had lived for nine months was being assessed as a possible 'adoptive home.' A couple of weeks later, DCFS reported that five-and-a-half-year-old Jessica was 'saying more single words than she did prior to detainment,' and had 'gone to the bathroom on the toilet one time however remain[ed] in diapers.'

"In a status review report, prepared on or about August 25, 2009, DCFS reported that Father had not contacted the social worker 'since this case initially opened with DCFS.' Accordingly, DCFS provided no assessment of Father's compliance with the case plan. DCFS recommended that Father's reunification services be terminated. DCFS also reported that Jessica was having weekly monitored visits with the paternal grandmother.

"Father appeared at a September 28, 2009 status review hearing. Father's counsel informed the juvenile court that Father 'has visited with the child.' The court declined to terminate Father's reunification services, finding 'Father's compliance [with the case plan] has been partial -- been minimal, but he is visiting.'

"In a status review report, prepared on or about March 10, 2010, DCFS reported that Jessica was placed in the home of a new 'prospective adoptive parent' on January 22, 2010. DCFS explained: 'The family was close to the previous foster mother . . . and they were also Jessica's respite caretakers. Jessica is very familiar with her current caretakers and appears to be adjusting well in the new home. Jessica has been enjoying living with her four foster sisters and appears to be [quite] comfortable in the home. Jessica calls the foster mother "mommy." At Jessica's visit in February, Jessica was very excited to show [the social worker] her new bedroom.'

"DCFS also reported on Father's visitation with Jessica. He and the foster mother agreed that he would have monitored visits on Saturdays. The foster mother informed the social worker that Father had been 'consistent in visiting Jessica [between October and December 2009] and they had good visits.' At the end of December, Father stopped visiting. DCFS learned that Father was arrested on December 23, 2009 for an unidentified reason. Prior to that date, he had not enrolled in classes or counseling.

7

"Father appeared at a status review hearing on March 29, 2010. His counsel informed the juvenile court that he had been recently released from custody. The court ordered DCFS to set up a visitation schedule for Father. The court set the matter for a contest regarding termination of Father's reunification services, and ordered DCFS to assess relatives, including the paternal grandmother, for potential placement of Jessica.

"In late April 2010, DCFS reported that it still did not have contact information for Father. The paternal grandmother told the social worker that Father had moved in with his girlfriend, but she did not have contact information for him. The foster mother reported that Father contacted Jessica once in March, but did not provide a telephone number where he could be reached.

"Father appeared at the contested review hearing on May 4, 2010. His counsel informed the juvenile court that he had participated in a domestic violence program and intended to participate in parenting classes and counseling. The juvenile court terminated his reunification services and ordered DCFS to set up a visitation schedule for him and his relatives.

"On or about August 27, 2010, DCFS prepared a report for the section 366.26 hearing. DCFS recommended that the juvenile court terminate Father's parental rights and select adoption as the appropriate permanent plan for Jessica. The foster mother still expressed interest in adopting her. DCFS reported visits with Jessica by the paternal grandparents, but did not report any visits by Father. In July 2010, Father informed the social worker that he was temporarily living at his mother's home.

"After the section 366.26 hearing was continued, DCFS prepared another report on or about October 19, 2010. DCFS informed the juvenile court that Father had 'maintained accessional [sic] contact with caregiver and Jessica.' The foster mother arranged for Father and the paternal grandparents to have visits with Jessica on Sundays. DCFS reported that Father had visits with Jessica on July 18, August 29 and September 12, 2010, and spoke with her on the phone on July 15, September 6 and September 11, 2010. The foster mother stated that 'the visits went well and Jessica enjoy[ed] seeing her family.' The paternal grandfather told the social worker that,

8

although he did not have contact information for Father, the social worker could mail letters to Father at the paternal grandmother's home and the letters would be delivered to Father. The paternal grandparents did not live together.

"On October 26, 2010, the social worker met with the paternal grandmother 'and completed a walk through' of the paternal grandmother's home. The social worker recommended minor corrections to the home and referred the matter for a kinship home assessment.

"The juvenile court conducted the section 366.26 hearing on October 28, 2010. The parties stipulated that if the paternal grandmother were called to testify she would state: (1) that she had completed a foster and kinship care training program at a community college; (2) that she was willing to care for Jessica; (3) that she felt she was capable of taking care of Jessica's needs; (4) that she was willing to adopt Jessica; and (5) that she was 'willing to do whatever the court ask[ed] to have Jessica G[.] in her care.'

"Father testified at the hearing. He stated that he and his family members would travel about 63 miles on Sundays to visit Jessica at her foster home. He would set out for his Sunday visits at about 10:00 or 11:00 a.m. He would spend the day with Jessica, and leave for home at about 5:00 or 6:00 p.m. The visits took place at Jessica's foster home and at a park and restaurant near the foster home. Father's parents attended these visits, and occasionally one of his brothers made the trip with them.

"Father also had the opportunity to visit with Jessica closer to his own home. When Jessica's foster mother was visiting the mall near Father's home, she would call Father and allow him to visit Jessica at the mall.

"Father tried to have telephone contact with Jessica at least once a week. He was mindful of her schedule and her early bedtime at her foster home. When he worked late, he was unable to speak with Jessica on the phone.

"Father characterized his relationship with Jessica as 'different' from the relationship she had with anyone else. He described Jessica as 'a child trapped in a box, that – her brain doesn't connect with her mouth that well.' He explained that he had

9

'always been able to understand everything she says.' He believed that when Jessica was with him she felt 'like a normal kid' because she did not need to 'try[] as hard to pronounce these words.' According to Father, Jessica was 'a little more in tune, a little more attentive to the situation' during their visits. Father would bring 'learning toys and different books' to share with her.

"Father believed that Jessica was 'very attached to [him].' When they would see each other, she appeared to feel excited and that she was special. Father explained: '[T]hat excitement that she has when she sees me is very -- is very tremendous, to the point where you can notice that, in that brief moment, she's particular in that house, not just another member of where she's at.' During visits and phone calls, Jessica would refer to Father as 'Papa Alex' because her foster sisters knew Father as 'Alex.' Jessica would carry pictures of Father in her bag when she went to school.

"Father stated that, before Jessica's removal, he had been the one who had taken care of Jessica, changing her diaper, playing with her and taking on most of the parental responsibilities.

"Although Father appreciated everything the foster mother had done for Jessica, and believed her to be 'a really good person,' Father did not want the foster mother to adopt Jessica. He wanted the juvenile court to place Jessica in his mother's home. The family had spent about $10,000 to remodel the home so that it would be ready for Jessica to live there.

"During oral argument, DCFS's and Jessica's counsel urged the juvenile court to terminate Father's parental rights. Both asserted that Father's visitation had not been as frequent as he had testified. Jessica's counsel also argued: '[Father] has just recently entered into her life. And at this point in time, Jessica looks to the current caretaker as her parent. And she's there with her every day and looks to her for her everyday needs. She has been with this caretaker for almost a year now. And she is stable with the current caretaker, and they do have a bond, parent-child-relationship-type bond. [¶] And Jessica does have very special needs. The caretaker is taking care of these special needs. And she has been very willing to allow the father and the paternal relatives to visit. . . .'

10

"The juvenile court concluded that Father satisfied the parent-child exception to termination of parental rights under section 366.26, subdivision (c)(1)(B). The court identified legal guardianship as the permanent plan for Jessica. In making its ruling, the juvenile court stated, in pertinent part:

"'I was very impressed with father's testimony. And I will tell you why. It's very clear that he has a deep love for his child. And that's impressive to me because that -- there are a lot of fathers in this system and out of the system who do not step up to the plate for their child, particularly one who has these special needs.

"'But what came through to me, in a way that doesn't come through in the reports, from father's testimony is the love his child has for him. And I've observed it when they were here in court.

"'But his testimony about the time he spends with his daughter, you know, the efforts that he's made to preserve this relationship -- and, frankly, I think she looks to him as being her father. I think that's pretty clear to me. It's also clear to me that the -- the caretaker would want to continue the familial relationship with father and his family.

"'But here's my concern is that maybe that will work out, and maybe everything will be fine. But once I terminate parental rights, those parental rights are terminated, and you can't undo that. And you can't undo that if, for some reason, this person can't care for Jessica.

[¶] . . . [¶]

"'And, usually, when I'm considering all those factors, the child's need for stability outweighs the relationship that they have with their parent. But in this case, I have to say I don't think that's -- that's true. I think this father is very, very important to Jessica.

[¶] . . . [¶]

"'I think Jessica does look to that -- the caretaker as being her parent. But I also think she looks to her father as being her dad. And he's gone out of -- both the caretaker and the father have gone to extraordinary circumstances to maintain this relationship. And it is a relationship that is worth maintaining.

11

"'And I can't take the chance that something is going to happen to that relationship. We can always reconsider adoption at a later point. We can never reconsider termination of parental rights.

"'So I just think, in this particular case -- and this is not something I very often find -- but I think this relationship is too important to Jessica to risk it being terminated. And I think she benefits from having father in her life.'

"Jessica's counsel appealed. DCFS has not submitted a brief on appeal." (*In re Jessica G.*, *supra*, B228731, pp. 2-11.)

We affirmed the order, stating in pertinent part: "We are mindful of the legislative preference for adoption but, on this record, we will not disturb the juvenile court decision declining to terminate parental rights. Substantial evidence demonstrates that Father occupied a parental role in Jessica's life and that "'severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed.'" [Citation.] The evidence shows that, with Father, Jessica seemed to feel confident and understood despite her developmental delays. He provided a place in the world where she felt special and 'complete.' The juvenile court did not err in preserving this relationship." (*In re Jessica G.*, *supra*, B228731, p. 15.)

**Additional Facts in Case No. 241254** (*Cesar G. v. Superior Court*, *supra*, B241254, pp. 5-7.)

"We issued the opinion [in Case No. B228731] on November 17, 2011, and, two days later, on November 19, 2010, Letters of Guardianship issued to prospective adoptive parent Aida R.

"In his November 2, 2011 Status Review Report, CSW [Children's Social Worker] Jorge Gomez states that Jessica meets special education criteria for Mental Retardation and is in special education classes. She is a client of the Regional Center, which funds an in-home behavioral program for Jessica through Counseling Solutions for Families and Children. That program addresses the following behavioral concerns: Jessica engages in disruptive social behaviors 'which can occur almost daily in all

12

settings'; she has '[p]roblems with boundary and personal space of others'; she displays hyperactivity and 'resistance on a daily basis in all settings when she is not able to get her way'; at times, Jessica 'displays aggressive social behaviors in terms of physically hitting and biting others.'

"Jessica had a two-week visit with Father and paternal grandmother Graciela G. at their home in mid-July 2011. The visit ended two days early, 'because paternal grandmother said she was very tired and had other personal activities to attend to.'

"On July 26, 2011, Father and paternal grandmother Graciela G. requested that Jessica be returned to Father's care. Their plan was that paternal grandmother Graciela G., who is not employed, would watch Jessica in the mornings, while Father, who has a part-time job, would watch Jessica in the afternoons. CSW Gomez states that he 'knows that father cannot drive due to suffering from epilepsy attacks which are unpredictable. Mrs. G[., paternal grandmother,] expressed that she also has some other personal things to attend to, and that care of the child demands too much time from every[]one in the house. CSW stated that they can let him know what the plans are for the care of Jessica and then it will be considered. [¶] It was the perception of CSW that Mrs. G[., paternal grandmother,] gets too stressed taking care of Jessica and that this placement might not last long or be in the best interest of child Jessica as permanent placement.'

"Father did not attend the April 20, 2012 Individualized Education Program (IEP) meeting, which is conducted on a yearly basis to review Jessica's educational needs and to set goals for Jessica and guidance for her educators.

"In the May 2, 2012 Status Review Report, CSW Alejandro Carrillo states that Jessica had overnight weekend visits with Father at his home every other week. She returned to the home of Aida R. 'in good spirits and has no behavioral problems after the visits.'

"CSW Carrillo further reports that Jessica had eye-muscle surgery[2] at Loma Linda Hospital on January 11, 2012. When CSW Carrillo asked Father why he did not

---

[2] The surgery was most likely to correct Jessica's strabismus.

attend the surgery, Father answered 'that he could not remember but maybe it was because he had had a[n epileptic] seizure.' CSW Carrillo adds: 'Although Father has continued to have consistent contact with Jessica and states that he would like for Jessica to live with him and his family[,] Father has made no effort in being involved in any of Jessica's appointments for her medical or educational needs. On 1/11/12 Jessica had an eye surgery, that although was not life threatening, she was still placed under general anesthesia. Legal guardian [Aida R.] informed him nearly a month prior to the surgery and father still failed to show up to the hospital for the surgery. Legal guardian [Aida R.] stated that she called father and paternal grandmother the morning of the surgery to inform them that Jessica was at the hospital and legal guardian was told by paternal grandmother that she would not be able to make it because she had other personal errands to complete and that she did not know where father was. Legal guardian [Aida R.] stated that father did not see Jessica until about 3 weeks after the surgery.

"'Jessica appears to be well adjusted to the home. She walks around the house and interacts with the other minors in the home appropriately. She refers to legal guardian [Aida R.] a[s] mommy. Jessica has shown CSW her room and other rooms. She knows who sleeps in the rooms. Legal guardian [Aida R.] has continued to meet all of Jessica's needs, which include her medical, emotional, educational and physical needs.'

"Aida R. told CSW Carrillo that she wants to adopt Jessica and that she would continue to allow Father to have contact with Jessica.

"At the May 2, 2012 hearing, the juvenile court set a permanency planning hearing pursuant to section 366.3." (*Cesar G. v. Superior Court*, *supra*, B241254, pp. 5-7.)

Father filed a writ petition, challenging the order setting the permanency planning hearing. We denied the petition, finding the record provided prima facie evidence that circumstances changed subsequent to the juvenile court's October 28, 2010 order identifying legal guardianship as the permanent plan. We cited Aida R.'s willingness to allow Father to maintain regular visitation with Jessica, the narrowing of the possibility that Jessica could be returned to Father's care on a permanent basis, Father's failure to help prepare Jessica for her eye surgery or to visit her in the hospital after the surgery,

14

and Father's failure to attend Jessica's IEP meeting.  (*Cesar G. v. Superior Court*, *supra*, B241254, pp. 8-10.)

**Additional Facts in Current Appeal**

DCFS prepared a report for the August 29, 2012 section 366.26 hearing.  DCFS stated paternal grandmother Graciela G. would pick up Jessica for overnight visits with Father every two to three weeks.  Prospective adoptive parent Aida R. told DCFS Graciela G. "is the one who is responsible for Jessica's care" during these visits.  DCFS reported Aida R. "is willing to have an open adoption," but she "she does not want to be bound [by] any legal document" regarding Father's visitation."  Aida R. told DCFS "she has kept the visits between the father and the child since 2010 and she is committed to keep the same agreement."  At the time DCFS prepared this report, Mother was incarcerated and had not had a visit with Jessica in about a year.

In the section 366.26 report, DCFS provided the following information about eight-year-old Jessica's medical conditions:  "She suffered of [sic] convulsions until two years ago.  The child has been diagnosed with autism and behavior disorder.  She is in special education and receives speech, physical and occupational therapy.  Regional Center was providing therapy to deal with the behavior disorder.  Therapy was discontinued due to the curtailment of benefits from Regional Center.  The child had a previous surgery to correct part of the intestine.  On 1/11/2012, she had surgery to correct the crossed eyes.  The legal guardian stated that perhaps the child will need another eye surgery.  Meanwhile, she needs to keep a patch on one of the eyes daily for 4 hours."

DCFS also stated in the report that Jessica's social worker believed adoption was the appropriate permanent plan for Jessica because Father "is unable to care for the child.  He needs assistance with Jessica's care due to his health condition.  The paternal grandmother is unable to commit herself to the care of Jessica and her son (the father) on a regular basis because she has to meet her own needs."

The continued section 366.26 hearing was scheduled for November 1, 2012.  That day, DCFS informed the juvenile court Aida R.'s home study was completed and

approved.  Aida R. lived in a five-bedroom home with her husband, three adopted children (ages 18, 13 and 11), and an 11-month-old foster child.

In an addendum report prepared for the November 1, 2012 hearing, DCFS stated: "Although the father continues visiting twice a month there is concern that the father would be unable to take care of Jessica.  It has been reported that the child's father suffers of [sic] Epilepsy.  He depends on others to meet his own needs.  He resides with friends where space is limited and he works odd jobs to support himself.  It has also been reported that he is unable to drive due to seizures."

DCFS also stated:  "On 01/22/2010, Jessica was placed in the home of the potential adoptive parents.  Since the child's placement, the bonding between the child and the potential adoptive parents appear[s] to get stronger with time.  Jessica appeared very comfortable from the very beginning.  The child is affectionate towards them and she appears to have reached such a level of comfort in the home that she seems that she has been in the home forever.  The child regards the potential adoptive parents as her own caregivers."  DCFS reported Mr. and Mrs. R. had been "so diligent" in meeting Jessica's special needs and in "providing Jessica with a safe and nurturing home where she appears to feel safe and secure."  DCFS recommended the juvenile court terminate parental rights and identify adoption as Jessica's permanent plan.

At the November 1, 2012 section 366.26 hearing, the juvenile court received in evidence DCFS's August 29 and November 1, 2012 reports described above.  DCFS did not present any additional evidence.

Father testified on his own behalf and stated he wanted custody of Jessica.  He tried to visit her every other weekend at Graciela G.'s home, and he was consistent with that schedule about 85 percent of the time.  During these visits, Father and Graciela usually would pick up Jessica on Friday and return her to Aida R. on Sunday.  Sometimes the visits were limited to a Saturday.  Father stated he was able to visit with Jessica on these occasions without any supervision.  During winter, spring and summer vacations, Father sometimes visited with Jessica for "maybe a week or something."

16

Father testified Jessica called him "'Dad.'" When others were speaking to Jessica, they referred to Father as "'Pappi Alex.'"

In his testimony, Father characterized Jessica's special needs as "a light autism and a speech impediment and some behavioral issues, which have calmed down in the last year or two." Father stated he took classes at "Rio Hondo" to learn how to deal with Jessica's special needs. Father testified those classes "tell me how to pertain with all these problems that she has and how to deal with certain situations that might come up with her. And they show me how to be patient and analyze the child and try to understand what the child's needs are, a response to their necessities at the time." Father stated he and Jessica have "a really good relationship so the training -- it just opens my eyes a little bit more to certain problems she might have throughout the day, which are just easier to fix by having that type of training."

On cross-examination, Father testified he was Jessica's primary caretaker during visits, but Graciela would take care of Jessica when Father had "to go run an errand or something like that." Father stated Jessica "likes hanging around with" him. He described his weekend activities with Jessica as follows: "[I]n the morning we try to have breakfast together and then we'll plan a day either at the park or we'll go watch a movie, depending on what time the movies are playing. She has a lot of educational games as well as educational video games that we just play all day. It's pretty much an all-day thing." Father cooked for Jessica. He did not help her with her schoolwork, but there was a desk and a chalkboard in her room at Graciela's home where Jessica drew and did math problems. Father did not know the names of any of Jessica's doctors, but he believed DCFS had provided him with that information and he would have it if Jessica needed medical assistance.

DCFS and Jessica's counsel argued Father did not establish the parent-child relationship exception to termination of parent rights under section 366.26, subdivision (c)(1)(B)(i), applied, and the juvenile court should terminate parental rights. Father and Mother argued the exception applied to the relationship between Father and Jessica.

17

The juvenile court terminated Father's and Mother's parental rights, finding the exception did not apply. The court identified adoption as the appropriate permanent plan for Jessica. Father and Mother appealed.

## DISCUSSION

Father and Mother contend the juvenile court erred in terminating their parental rights because Father established the parent-child relationship exception applied to his relationship with Jessica. Mother does not argue the exception applies to her relationship with Jessica. Father also argues, and Mother joins his argument, that our decision in the first appeal (Case No. B228731), affirming the juvenile court's order identifying legal guardianship as Jessica's permanent plan and preserving Father's parental rights, is law of the case. For the reasons discussed below, we reject Father and Mother's arguments.

In the prior writ proceeding in this matter (Case No. 241254), we explained the juvenile court did not abuse its discretion in setting a new section 366.26 hearing pursuant to section 366.3 because prima facie evidence demonstrated changed circumstances indicated adoption was the appropriate permanent plan for Jessica. (§ 366.3, subd. (c); *Cesar G. v. Superior Court*, *supra*, B241254, pp. 7-10.)

"At a hearing under section 366.26, the court is required to select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.) When the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the court must terminate parental rights unless the parent opposing termination can show that one of the exceptions set forth in section 366.26, subdivision (c)(1) applies. (*Ibid*.) "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

"'The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions.'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.) To satisfy the burden of proving the parent-child relationship

18

exception to termination of parental rights under section 366.26, subdivision (c)(1)(B), a parent must demonstrate that he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The second prong of this exception requires the parent to demonstrate that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Even frequent and loving contact between a child and a parent is not sufficient, by itself, to establish the significant parent-child relationship required under subdivision (c)(1)(B). (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) A "*parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one" because "[i]t would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The juvenile "'court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) "The factors to be considered include: '(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' [Citation.]" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

"Reviewing courts have applied various standards of review when considering trial court determinations of the applicability of these statutory exceptions to termination of parental rights. In *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, the court observed that both the substantial evidence test and the abuse of discretion test have been applied, and the court stated that '[t]he practical differences between the two standards of

19

review are not significant. "[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only '"if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." . . .'" [Citations.] However, the abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in cases like this one, especially since the statute now requires the juvenile court to find a "compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)[ (B) ].) That is a quintessentially discretionary determination. The juvenile court's opportunity to observe the witnesses and generally get "the feel of the case" warrants a high degree of appellate court deference. [Citation.]' [Citation.]" (*In re Scott B.*, *supra*, 188 Cal.App.4th at p. 469.)

As DCFS points out, in *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1528, the Court of Appeal articulated a standard of review applicable in cases in which a parent fails to meet his or her burden of proof on the parent-child relationship exception to termination of parental rights. There, the appellate court explained: "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]" (*Id.* at p. 1528.)

Under any standard of review, we will not disturb the juvenile court's decision to terminate parental rights because Father did not establish the parent-child relationship exception applied to his relationship with Jessica. Father satisfied the first prong of the

20

exception by showing that he had maintained regular visitation and contact with Jessica. But he did not satisfy the second prong of the exception because he did not demonstrate the requisite benefit to Jessica from preserving his parental rights.

At the November 1, 2012 section 366.26 hearing, Father presented evidence that he had consistent overnight visits with Jessica. But he did not present evidence demonstrating those visits promoted Jessica's well-being in a manner that outweighed the well-being she would gain through the permanence of adoption. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Nor did he present evidence demonstrating Jessica would be "'greatly harmed'" if his parental rights were terminated. (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.)[3]

In contrast, at the prior section 366.26 hearing on October 28, 2010, when the juvenile court declined to terminate his parental rights, Father presented evidence of very different circumstances. He demonstrated his interactions with Jessica at that time caused her to relax and to feel more confident because he understood what she was saying despite her severe speech delays. As we stated in our opinion in the prior appeal, "He provided a place in the world where she felt special and 'complete.'" (*In re Jessica G.*, *supra*, B228731, p. 15.) There was no evidence at the November 1, 2012 section 366.26 hearing showing that Father still occupied that role in Jessica's life.

The evidence demonstrated Jessica felt comfortable, safe and secure in Aida R.'s home, where she had been living for more than two and a half years. As DCFS stated in a report for the November 1, 2012 hearing, Jessica "appears to have reached such a level of comfort in [Aida R.'s] home that she seems that she has been in the home forever." There was no evidence indicating Jessica's relationship with Father was particularly important for her well-being.

---

[3] We have no reason to believe Aida R. will discontinue Father's visits if and when she adopts Jessica, but we do not rely on that factor in affirming the termination of parental rights because Aida has expressed her unwillingness to enter into a contract regarding Father's visitation.

Father presented evidence demonstrating he took care of Jessica's basic needs during visits.  But he did not get involved with her medical or educational needs.  He demonstrated he provided frequent and loving contact, but that is not enough to preserve parental rights.  (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at pp. 1418-1419.)  He did not show he occupied a parental role in Jessica's life or still promoted her well-being in some substantial way (as he was shown to have done at the time of the October 28, 2010 hearing).

We reject Father's argument the doctrine of law of the case prevented termination of parental rights.  This position does not allow for the fluid nature of these situations.  In the prior appeal in this matter (Case No. B228731), we did not state any rule of law which would prevent termination of parental rights.  "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' [Citations.]"  (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893.)  In the prior appeal, we affirmed the juvenile court's preservation of parental rights based on substantial evidence in the record.  Now, we affirm the juvenile court's termination of parental rights based on substantial evidence of different circumstances.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


MALLANO, P. J.                                    JOHNSON, J.


22